## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **CHRISTOPHER REHM and MATTHEW OLDANIE, individually and on behalf of all others similarly situated,** | ) ) ) | |
| | ) | **Case No. 1:24-cv-1014** |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | |
| **PROGRESS SOFTWARE CORPORATION, WELLTOK LLC, and OSF HEALTHCARE SYSTEM,** | ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

### CLASS ACTION COMPLAINT

Plaintiffs Christopher Rehm ("Rehm") and Matthew Oldanie ("Oldanie") (together, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), bring this Class Action Complaint ("Complaint") against defendants Progress Software Corporation ("PSC"), Welltok LLC ("Welltok"), and OSF Healthcare System ("OSF") (collectively, "Defendants") to redress and curtail Defendants' failure to properly secure and safeguard Plaintiffs' and the Class's personally identifiable and private health information.

### INTRODUCTION

1.     This data breach class action lawsuit arises from Defendants' failure to safeguard and timely notify Plaintiffs and the Class of their breached Personally Identifiable Information ("PII") and Personal Health Information ("PHI").

2.     Defendant PSC is a publicly traded, international software company offering a wide range of products and services to corporate and governmental entities throughout the United States, including cloud hosting and file transfer services such as MOVEit.

3.     Defendant Welltok is a software service company that partners with healthcare organizations across the United States, including OSF, maintaining online wellness programs, holding databases with personal patient data, generating predictive analytics, and supporting healthcare needs like prescription management. Welltok utilized PSC's MOVEit file transfer program and received the PII and PHI for OSF patients in connection with these services.

4.     Defendant OSF is a healthcare organization that operates health care facilities in Illinois and throughout this District. In connection with its provision of healthcare services, OSF collects, maintains, and stores its patients PII and PHI. OSF shares this data with Welltok, which operates OSF's patient notification and contact platform.

5.     On or before May 27, 2023, cyber criminals linked with the Russian cyber gang, Cl0p, exploited a well-known flaw in PSC's MOVEit file transfer service to gain access to its servers, ultimately acquiring data containing sensitive PII and PHI held by Welltok and belonging to OSF patients (the "Data Breach").

6.     Cl0p is known for using stolen data to extort its victims, as well as publishing and selling the stolen data to other bad actors on the dark web.[1] On August 10, 2023, it threatened to release the stolen data of all companies which had not paid the ransom by August 15, 2023.[2]

7.     The Data Breach was entirely preventable. The flaw that Cl0p exploited was "among the oldest forms of vulnerability and are the result of poor coding practices."[3]

---

[1] David Kasabji, *CLOP Group – Analysis of European's rising ransomware threat*, CONSCIA: BLOG (Sept. 6, 2023), https://conscia.com/blog/cl0p-group-analysis-of-europeans-ransomware-threat/#:~:text=CL0P%20gained%20notoriety%20for%20employing,software%20to%20launch%20ransomware%20attacks.

[2] Olivia Powell, *IOTW: A full timeline of the MOVEit cyber attack*, CYBER SEC. HUB (June 23, 2023), https://www.cshub.com/attacks/news/iotw-a-full-timeline-of-the-moveit-cyber-attack.

[3] Yash Mehta, *Deconstructing the CL0P RaaS group and understanding the MOVEit breach in 2023*, SECTRIO: OT & IOT SEC. BLOG (Sept. 11, 2023), https://sectrio.com/deconstructing-cl0p-ransomware-moveit-2023-breach.

8.      Plaintiffs and members of the Class furnished their sensitive PII and PHI directly or indirectly to OSF and Welltok, including their names, dates of birth, Social Security numbers, and health insurance information. OSF also kept and provided additional sensitive PII and PHI to Welltok, including medical treatment and diagnosis information, provider names, patient IDs, and treatment cost information.

9.      Defendants failed to properly secure and safeguard Plaintiffs' and the Class's PII and PHI that was stored within the MOVEit servers.

10.     Despite purporting to act as a safe container for sensitive information, Defendants failed to take precautions designed to keep that information secure and instead left it easily exposed to criminals and other bad actors.

11.     OSF and Welltok delayed acknowledging and giving notice of the Data Breach, waiting until December 4, 2023, at the earliest to issue notice. *See*, *e.g.*, Exhibits A-B, notice letters.

12.     Defendants owed and owe a duty to Plaintiffs and members of the Class to maintain adequate security measures to safeguard the PII and PHI with which they were entrusted. Defendants breached their duty by failing to implement and/or maintain adequate security practices.

13.     As a result of Defendants' failures, Plaintiffs and members of the Class now face an increased risk of identity theft and fraud, if not actual identity theft and resulting losses and need to take immediate action to protect themselves from such identity theft. Plaintiffs and members of the Class are immediately and imminently in danger of sustaining further direct or indirect injuries as a result of Defendants' failure to safeguard and protect their sensitive PII and PHI.

14.     Plaintiffs and the Class have suffered and will continue to suffer injuries including financial losses caused by misuse of their PII and PHI; the loss or diminished value of their PII as a result of the Data Breach; lost time associated with detecting and preventing identity theft; and theft of personal, medical, and financial information.

15.     By acquiring, utilizing, and benefitting from Plaintiffs' and the Class's PII and PHI Defendants assumed a duty to Plaintiffs and the Class. These duties include, but are not limited to:

    a.  Adequate data protection for PII, PHI, and financial information;

    b.  Compliance with standards set for Defendants' industry, including but not limited to those established under HIPPA and the FTC; and

    c.  Prompt and adequate notification in event of a breach.

16.     Defendants breached its duties to Plaintiffs and the Class in, but not necessarily limited to, the following ways:

    a.  By failing to reasonably safeguard its network systems and practices to adequately safeguard the PII, PHI, and financial information of Plaintiffs and the Class;

    b.  By failing to timely and accurately disclose that Plaintiff's and the Class's PII, PHI, and financial information had been compromised;

    c.  By failing to adequately protect and safeguard the PII, PHI, and financial information by knowingly falling below industry standards, despite obvious risks, and by allowing unmonitored and unfettered access to unsecured PII and financial information;

    d.  By failing to implement processes and/or procedures to quickly detect data breaches, security incidents, or unauthorized access; and

    e.  By failing to encrypt Plaintiff's and the Class's PII, PHI, and financial information and adequately monitor user behavior and activity in order to identify possible threats.

17.     The full extent of information regarding Defendants' security protocols and/or information pertaining to the breach are solely in Defendants' possession at this stage of litigation and will be made available to Plaintiffs during discovery stages.

## PARTIES

18.    Plaintiff Rehm is a natural person, a citizen of Illinois, and a resident of Bloomington, Illinois.

19.    Plaintiff Oldanie is a natural person, a citizen of Illinois, and a resident of Bloomington, Illinois.

20.    Defendant PSC is a Delaware corporation with its principal place of business located in Burlington, Massachusetts.

21.    Defendant Welltok is a Delaware corporation with its principal place of business located in Providence, Rhode Island.

22.    Defendant OSF is an Illinois corporation and conducts business in the State of Illinois, including throughout this District. In 2022 alone, OSF states that it serviced more than one million patients.[4]

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which some members of the class are citizens of states different than Defendants. *See* 28 U.S.C. § 1332(d)(2)(A). This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

24.    This court has personal jurisdiction over Defendants. Defendants have sufficient minimum contacts with the state of Illinois and intentionally avails itself of the consumers and markets within the state through the promotion, marketing, and sale of their products and services.

---

[4] *Facts & Figures*, OSF HEALTHCARE (Oct. 1, 2023), https://x.osfhealthcare.org/patients-visitors/about/facts-figures.

25.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(a)(2) because Defendants conduct substantial business in this district, and a substantial part of the events and/or omissions giving rise to the claims occurred, at least in part, within this district.

## FACTUAL BACKGROUND

### The Data Breach

26.     On or about May 31, 2023, PSC, the creator of the MOVEit software, announced that it was subject to a Data Breach,[5] which compromised highly sensitive PII and PHI of those that utilize the MOVEit software including names, dates of birth, health insurance information, provider names, treatment cost information, and treatment information and diagnoses.

27.     Welltok employs the MOVEit software, which is supplied by PSC. MOVEit's intended use is to safely move files as part of their routine operations. Within this process, Welltok uploads, retains, shifts, or retrieves PII/PHI owned or held by various companies on whose behalf it provides its various services. Sutter shared this data with Welltok, which managed it using the MOVEit software.

28.     On or about July 26, 2023, PSC informed Welltok of a vulnerability in the MOVEit software that was exploited by an unauthorized third party.

29.     Welltok reportedly performed an internal investigation into the scope of the vulnerability in MOVEit's software and the impact on its systems, revealing that an unknown third-party exploited software vulnerabilities, accessed its MOVEit transfer server, and exfiltrated certain data from the MOVEit transfer server on or about May 30, 2023. *See*, *e.g.*, Exs. A-B.

---

[5] *MOVEit Transfer Critical Vulnerability (May 2023) (CVE-2023-34362)*, PROGRESS CMTY. (June 16, 2023), https://community.progress.com/s/article/MOVEit-Transfer-Critical-Vulnerability-31May2023.

30.    On August 10, 2023, Cl0p announced that by August 15, 2023, it would be releasing the stolen data of all companies which had not paid the ransom on the dark web.

31.    On August 11, 2023, Welltok purportedly completed its investigation and confirmed the identities of individuals affected by the Data Breach, which included OSF patients who entrusted OSF (and in turn, Welltok), with their PII and PHI. *Id*.

32.    Welltok and OSF then waited until December 4, 2023, to first send notice of the breach to affected OSF patients. *Id*.

33.    In their notice, Defendants informed Plaintiffs and the Class that an "unknown actor exploited software vulnerabilities, accessed the MOVEit Transfer server ..., and exfiltrated certain data." *Id*. Coupling these vague references with the statement that "we have no evidence that any of your information has been misused," Defendants intentionally understated the risks and harms associated with the Data Breach.

34.    Individuals impacted by the Data Breach, like Plaintiffs and the Class, remain at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

***The Harm***

35.    The United States Department of Health and Human Services defines data breach as "The illegal use or disclosure of confidential health information that compromises the privacy or security of it under the privacy rule that poses a sufficient risk of financial, reputational, or other type of harm to the affected person."[6]

36.    Victims of data breaches are harmed in a number of ways. For example, victims face tangible financial harm. According to the Digital Guardian, the average cost of a data breach

---

[6] *See* Adil Hussain Seh *et al*., *Healthcare Data Breaches: Insights and Implications*, 8 HEALTHCARE (BASEL) 133 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/pdf/healthcare-08-00133.pdf.

per user in 2019 was $429 per record, more than double any other industry and substantially higher than the average cost per user ($150).[7]

37.     Victims of data breaches suffer imminent, substantial, and life-long risk of identity theft. The PII stolen during the Data Breach contains all of the information wrongdoers need to misuse Plaintiffs' and Class members' identities to their detriment.

38.     Victims also suffer injury in the diminution in value of their PII – an innumerable harm as PII cannot be changed or replaced if stolen or compromised. PII/PHI is very valuable to criminals, as evidenced by the prices they will pay for it on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information is sold at prices ranging from $40 to $200, and bank details have a price range of $50 to $200.[8]

39.     Even worse, all-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[9] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[10]

---

[7] *See* Chris Brook, *What's the Cost of a Data Breach in 2019?*, DIGITAL GUARDIAN: BLOG (Aug. 22, 2022), https://www.digitalguardian.com/blog/whats-cost-data-breach-2019.

[8] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/#:~:text=To%20gain%20access%20to%20someone's,range%20of%20%2450%20to%20%24200.

[9] *See* Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC MEDIA (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurancecredentialsfetch-high-prices-in-the-online-black-market.

[10] *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain,* FED. BUREAU OF INVESTIGATION: CYBER DIV. (Apr. 8, 2014), https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf.

40.     Here, Cybercriminals took the PII/PHI of Plaintiffs and members of the Class to engage in identity theft, healthcare fraud, and/or to sell it to other criminals who will purchase the PII/PHI for that purpose. The fraudulent activities resulting from the Data Breach may not come to light for years.

41.     As a result, Plaintiffs and the Class are at a life-long risk of serious and irreversible privacy risks.

***The Regulatory Requirements and Industry Practices***

42.     Federal and state regulators have established security standards and issued recommendations to temper data breaches and the resulting harm to consumers, especially within the healthcare sector.

43.     Despite readily available industry standards and data safeguarding practices, Defendants failed to secure the PII, PHI, and financial information of Plaintiffs and the Class, which ultimately lead to the Data Breach.

44.     For example, at least 24 states have enacted laws addressing data security practices that require businesses to maintain reasonable security procedures and practices and to protect PII and PHI from unauthorized access.

45.      In addition, cybersecurity firms have promulgated a series of best practices that – at minimum – include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security

systems; protecting against any possible communication system; and training staff regarding critical points.[11] Defendants did not follow these minimum best practices.

46.     The Federal Trade Commission ("FTC") also sets the standard for safeguarding sensitive data. According to the FTC, the need for data security should be factored into all business decision-making.[12]

47.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.[13] These guidelines urge businesses to protect personal customer information, properly dispose of PII that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct security problems.

48.     FTC guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor incoming traffic for activity indicating someone is attempting to hack the system, watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

49.     Finally, the FTC instructs companies to not maintain PII any longer than necessary to complete an authorized transaction, limit access to sensitive information, require complex network passwords, and verify that third-party service providers have implemented reasonable, industry-tested security measures.[14]

---

[11] *See Addressing BPO Information Security: A Three-Front Approach*, DATAMARK, INC. (Nov. 2016), https://perma.cc/NY6X-TFUY?type=standard.

[12] *Start with Security: A Guide for Business,* FED. TRADE COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[13] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[14] *Start with Security: A Guide for Business*, *supra* note 12.

50.     The FTC has brought enforcement actions against businesses for failing to adequately protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

51.     The occurrence of the Data Breach, paired with Defendants' promise to revise their security measures after the Breach, indicates that Defendants neglected to implement one or more of the safeguards required by the FTC. This failure resulted in the theft of Plaintiffs and the Class's most sensitive personal data.

52.     In sum, Defendants' failures to appropriately store and maintain PII qualify as unfair and deceptive trade practices under Section 5 of the FTC Act. *See*, *e.g.*, *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1327 (N.D. Ga. 2019).

53.     Similarly, under HIPAA, Defendants must comply with the Privacy Rule, 45 C.F.R. Part 160 and 164, Subparts A and E, and the Security Rule, 45 C.F.R. Parts 160 and 164, Subparts A and C. The Privacy and Security Rules set nationwide standards for protecting PHI, including electronically stored PHI. These rules require Defendants to:

   a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

   b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

   c.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

      d.      Ensure compliance by its workforce.[15]

54.     Defendants are also required to follow the regulations for safeguarding electronic PHI pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

55.     Both HIPAA and HITECH obligate Defendants to follow reasonable security standards, respond to, contain, and mitigate security violations, and to protect against disclosure of sensitive patient Private Information. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); 45 C.F.R. § 164.530(f); 42 U.S.C. §17902.

56.     As alleged in this Complaint, Defendants have failed to comply with HIPAA and HITECH. They have failed to maintain adequate security practices, systems, and protocols to prevent data loss, failed to mitigate the risks of a data breach and loss of data, and failed to ensure the confidentiality and protection of protected health information.

57.     Finally, the FTC Safeguard Rule includes § 318.4 Timeliness of notification. This section holds that all covered entities who experience a data breach – other than those exempt due to ongoing criminal investigation – shall notify impacted individuals without unreasonable delay and in no case later than 60 calendar days after the discovery of a breach of security.

58.     Defendants delayed notification by nearly six months after discovery of the breach of security and four months after the close of their investigation. This delayed response deprived Plaintiffs and the Class of valuable time to mitigate the risks of identity theft, fraud, and other consequences of the Data Breach.

---

[15] *Summary of the HIPAA Security Rule*, U.S. DEP'T OF HEALTH AND HUM. SERVS., http://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html (last visited Aug. 22, 2023).

***Defendants' Failures***

59.     Defendants participated and controlled the process of gathering and storing Plaintiffs' and the Class Members' PII, PHI, and financial information.

60.     In so doing, Defendants assumed and otherwise owed duties and obligations to Plaintiffs and the Class to take reasonable measures for the protection of the data collected. This includes the duty of oversight, training, instruction, and testing of the data security systems and policies in place. Defendants breached these obligations and their duties to Plaintiffs and the Class and were otherwise negligent in failing to safeguard their PII, PHI, and financial information. Upon information and belief, Defendants' unlawful, reckless, and/or negligent conduct, included, but was not limited to, one or more of the following acts and/or omissions:

    a.  Failing to design and maintain an adequate data security system to reduce the risk of data breaches and protect Plaintiff's and Class Members' PII;

    b.  Failing to properly monitor its data security systems for data security vulnerabilities and risk;

    c.  Failing to test and assess the adequacy of its data security system;

    d.  Failing to develop adequate training programs related to the proper handling of emails and email security practices;

    e.  Failing to develop and put into place uniform procedures and data security protections for its network;

    f.  Failing to adequately fund and allocate resources for the adequate design, operation, maintenance, and updating necessary to meet industry standards for data security protection;

    g.  Failing to ensure or otherwise require that it was compliant with FTC guidelines for cybersecurity;

    h.  Failing to ensure or otherwise require that it was adhering to one or more of industry standards for cybersecurity discussed above;

    i.  Failing to implement or update antivirus and malware protection software in need of security updating;

    j.  Failing to require encryption or adequate encryption on its data systems;

k.  Otherwise negligently and unlawfully failing to safeguard Plaintiff's and Class's PII, PHI, and financial information provided to Defendants, which in turn allowed cyberthieves to access its IT systems.

61.    Defendants' failure to adequately secure Plaintiff's and the Class's PII breaches its statutory and common law duties to safeguard the sensitive data. Moreover, Plaintiffs would not have provided their private, sensitive information to Defendants if they had known it would not be safeguarded per basic regulatory and industry standards.

62.    Defendants negligently failed to take appropriate steps to protect Plaintiffs' and the Class's PII and PHI, resulting in a breach of Plaintiffs' and the Class's highly sensitive data.  Also in their notice, Defendants fail to name the safeguards protecting users' PII, PHI, and financial information, how the unnamed third party gained access to the system, the changes being implemented to protect from future breaches, or why it took Defendants more than four months to disclose the Data Breach to affected individuals.

63.    As compensation for their failures, Defendants are offering affected individuals a one-year memberships with Experian Identity Works ("Experian"); a product to monitor and detect possible misuse of personal information.

64.    In offering identity monitoring services, Defendants acknowledge that affected individuals are subject to imminent threat of identity theft and financial fraud.

65.    Defendants offer a one-year Experian membership require affected individuals to register, create an account, verify their identity, and checkout, just to receive the benefits of the limited-time membership, which does not include dark web monitoring, nor does it last long enough to adequately protect Plaintiffs' and Class members for the life-long vulnerability Defendants' failures have created.

66.    The fraudulent activity resulting from the Data Breach may not come to light for some time as many years can span between when PII is discovered, when it is stolen, and when it

is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[16]

67.     Beyond the steps required to activate an Experian membership, Defendants provide a list of actionable steps individuals should take to "remain vigilant" and "protect against potential fraud and/or identity theft." This list includes reviewing account statements and monitoring credit reports closely, reporting any suspicious activity to the financial institution with which the account is maintained, reporting any fraudulent activity or suspected incidents of identity theft to proper law enforcement authorities, including the police, state attorney general, and Federal Trade Commission. Defendants also recommend that affected individuals obtain a free copy of their credit report once every 12 months (or, alternatively, elect to purchase their credit reports), place a fraud alert on their credit reports, and/or place a credit freeze on their credit files. Exs. A-B.

68.     Should cyber criminals choose to fraudulently use the data they now have permanent and unfettered access to in two, four, or six years' time, Plaintiffs and the Class will be left defenseless. Further, should Plaintiffs and the Class seek to proactively monitor their PII for longer than one year, they will be left to bear the costs of such a service.

69.     In essence, Defendants seek to shift their duty to adequately safeguard and protect Plaintiffs' and the Class's PII and PHI onto the individuals themselves, all while retaining the financial benefits of failing to implement adequate security measures in the first place.

---

[16] *See Report to Congressional Requesters: Personal Information*, U.S. GOV'T ACCOUNTABILITY OFF. (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

**The Breach was Foreseeable**

70.     At all relevant times, Defendants knew or should have known the importance of safeguarding Plaintiff's and the Class's PII and of the foreseeable consequences that would result from a breach of their system – specifically, the significant costs that would be imposed on Plaintiffs and the Class as a result of Defendants' failure to properly safeguard their data.

71.     As a condition of its relationships with Plaintiffs and the Class, Defendants required that Plaintiffs and the Class entrust Defendants with highly sensitive and confidential PII and PII. Defendants, in turn, stored that information on unsecure systems that cyber criminals easily hacked.

72.     The Data Breach was entirely preventable. The flaw that Cl0p exploited was "among the oldest forms of vulnerability and are the result of poor coding practices."[17] Indeed, this particular vulnerability has been well known in the cyber security sector since at least 2003.

73.     In failing to implement adequate safeguards, Defendants disregarded the real possibility that their systems would be breached. For example, in 2022 alone, a record of 1,802 of data breaches has occurred, resulting in approximately 422.14 million sensitive records being exposed, a 24% increase from 2019.[18]

74.     The healthcare industry is particularly susceptible to this kind of attack. Between 2005 and 2019, the healthcare sector faced the highest number of data breaches, accounting for 61.55% of all data breaches during this time period.[19]

---

[17] *Mehta*, *supra* note 3.

[18] *See* Rob Sobers, *84 Must-Know Data Breach Statistics [2023]*, VARONIS: DATA SECURITY BLOG (Nov. 10, 2023), https://www.varonis.com/blog/data-breach-statistics.

[19] *Id.*

75.     Given the increased risk of data breaches in the healthcare sector, Defendants knew or should have known that a data breach was reasonably foreseeable. By neglecting the readily available information regarding best practices on securing sensitive information, Defendants breached its duties to safeguard Plaintiff's and the Class's PII, PHI, and financial information.

76.     Plaintiffs and Class Members now face a lifetime of constant surveillance of their personal, healthcare, financial records, and credit monitoring. Plaintiffs and the Class are presently incurring and will continue to incur such damages in addition to any fraudulent use of their PII and PHI.

77.     The foreseeable consequences of this data breach have now materialized, causing Plaintiffs and the Class to sustain imminent and concrete injuries and damages, including:

  a.   Invasion of privacy;

  b.   "Out of pocket" costs incurred mitigating the imminent threat of identity theft risk, including, but not limited to a more adequate credit monitoring service than the one offered by Defendants, and credit monitoring services extending beyond one year's time

  c.   Loss of time and productivity spent fielding increased spam and targeted marketing emails, and mitigating the imminent threat of identity theft and/or fraud

  d.   Actual identity theft, including the costs and loss of time incurred mitigating such theft

  e.   Imminent and continuing risk to their PII, which remains in Defendants' possession, and which is subject to further breaches as Defendants have not disclosed any improvements or concrete safeguards since implemented to their network system.

### CLASS ALLEGATIONS

78.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action to recover statutory penalties, prejudgment interest, attorneys' fees and costs, and other damages owed on behalf of themselves and all others similarly situated, initially defined as follows:

All persons whose PII and PHI was compromised as a result of the Data Breach announced by Defendants on or about December 4, 2023.

79.     Excluded from the class are Defendants, their affiliates, officers, directors, assigns, successors, and the Judge(s) assigned to the case. Plaintiffs reserve the right to modify, change, or expand the class definition based on discovery and further investigation.

80.     **Numerosity**: While the precise number of class members has not yet been determined, members of the class are so numerous that their individual joinder is impracticable, as the proposed class may include more than one million patients of OSF.

81.     **Typicality**: Plaintiffs' claims are typical of the claims of the class. Plaintiffs and all members of the class were injured through Defendants' uniform misconduct. The same event and conduct that gave rise to Plaintiffs' claims are identical to those that give rise to the claims of every other class member because Plaintiffs and each member of the class had their sensitive PII and PHI compromised in the same way by Defendants' same conduct.

82.     **Adequacy**: Plaintiffs are adequate representatives of the class because Plaintiffs' interests do not conflict with the interests of the class that they seek to represent; Plaintiffs have retained counsel competent and highly experienced in class action litigation; and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously. The interests of the class will be fairly and adequately protected by Plaintiffs and their counsel.

83.     **Superiority**: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the class. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for members of the class individually to effectively redress Defendants' wrongdoing. Even if class members could afford such individual litigation, the court system could not. Individualized litigation presents a

potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

84.   **Existence and Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to Plaintiffs and all members of the class. These questions predominate over the questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

a.   Whether Defendants owed a duty to Plaintiffs and Class Members to safeguard their PII and PHI;

b.   Whether Defendants negligently and/or unlawfully stored, maintained, transmitted, lost, or disclosed Plaintiff's and Class Members' PII and PHI;

c.   Whether Defendants breached its duty to Plaintiffs' and Class Members' to safeguard their PII and PHI;

d.   Whether an unauthorized third-party obtained Plaintiffs' and the Class Members' PII and PHI in the Data Breach;

e.   Whether Defendants promptly, adequately, and accurately informed Plaintiffs and Class Members that their PII and PHI had been compromised in the Data Breach;

f.   Whether Defendants failed and/or neglected to implement and maintain reasonable safeguards appropriate to the nature of the PII and PHI compromise and acceptable under standards set by common law, Defendants' industry, and the FTC;

g.   Whether Defendants' data security systems complied with applicable data security laws and regulations, including but not limited to HIPAA and FTC Regulations;

h.   Whether Defendants' data security systems were consistent with industry standards;

i.   Whether Defendants knew or should have known that it was at-risk of a security breach and its safeguarding practices were inadequate;

j.  Whether Plaintiffs and Class Members suffered legally recognizable damages as a result of Defendants' misconduct;

k.  Whether Defendants' conduct was negligent;

l.  Whether Defendants' conduct was negligent *per se*;

m.  Whether Defendants were unjustly enriched by Plaintiffs and Class Members; and

n.  Whether Plaintiffs and Class Members are entitled to damages, civil penalties, and/or injunctive relief as recourse for their injuries.

85.  Defendants acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the class, thereby making appropriate final injunctive relief and declaratory relief with respect to the class as a whole.

86.  Given that Defendants engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and common law and statutory violations are involved and common questions far outweigh any potential individual questions.

**COUNT I**
*Negligence*

87.  Plaintiffs realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

88.  Defendants obtained Plaintiffs' and Class Members' PII and PHI as a condition of providing services to Plaintiffs and Class Members.

89.  Defendants' acceptance and maintenance of this information is for its own pecuniary gain and as part of its regular business activities.

90.  Plaintiffs and the Class Members entrusted their PII and PHI to Defendants on the premise and with the understanding that Defendants would safeguard their information, use their PII and PHI for business purposes only, and/or not permit disclosure of their sensitive data to unauthorized third parties.

91.  Defendants had full knowledge of the sensitivity of the PII and PHI and the types of harm that Plaintiffs and Class Members could and would suffer if their PII and PHI were wrongfully disclosed.

92.  Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using individuals PII and PHI involved an unreasonable risk of harm to Plaintiffs and Class Members, even if the harm occurred through the criminal acts of a third party.

93.  Defendants owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

94.  Defendants' duty to use reasonable care arose from several sources, including but not limited to those described herein.

95.  Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendants. By collecting and storing valuable PII and PHI that is routinely targeted by criminals for unauthorized access, Defendants were obligated to act with reasonable care to protect against these foreseeable threats.

96.  Defendants were in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

97.  By assuming the responsibility to collect and to store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' PII and PHI held

21

within it— to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement security protocols and processes by which it could detect a breach of its network servers in a reasonably expeditious period of time and give prompt notice to those affected in the case of a data breach.

98.     Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

99.     Defendants had a duty to follow reasonable security standards, respond to, contain, and mitigate security violations, and to protect against disclosure of sensitive patient Private Information under HIPAA and HITECH. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); 45 C.F.R. § 164.530(f); 42 U.S.C. §17902.

100.     Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII and PHI.

101.     Defendants breached their duties (and thus were negligent) by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and PHI. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

   a.  Failing to adopt, implement and maintain adequate security measures and appropriate procedures to safeguard Class Members' PII and PHI;

   b.  Failing to adequately monitor the security of its networks and systems;

   c.  Failing to periodically ensure that its computer system had plans in place to maintain reasonable data security safeguards;

   d.  Failing to meet the minimum coding and industry standards for preventing cyberattacks and data breaches;

e.  Improperly and inadequately safeguarding the PII and PHI of Plaintiffs and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach;

f.  Failing to heed industry warnings and alerts to provide adequate safeguards to protect consumers' PII and PHI in the face of increased risk of theft;

g.  Allowing unauthorized access to Class Members' PII and PHI;

h.  Failing to detect in a timely manner that Class Members' PII and PHI had been compromised; and

i.  Failing to timely and adequately notify Class Members about the existence and scope of the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

102. It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiff's and Class Members' PII and PHI would result in injury to Plaintiffs and Class Members.

103. Further, the breach of security was reasonably foreseeable given the particularly high frequency of cyberattacks and data breaches in the healthcare sector.

104. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII and PHI would result in one or more types of injuries to Class Members.

105. Plaintiffs and Class Members had no ability to protect their PII and PHI that was in, and possibly remains in, Defendants' possession.

106. Defendants were in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

107. Defendants had and continue to have a duty to adequately and promptly disclose that the PII and PHI of Plaintiffs and Class Members within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

108.   Defendants have admitted that Plaintiffs' and Class Members' PII and PHI was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

109.   But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and Class Members, their PII and PHI would not have been compromised.

110.   There is a temporal and close causal connection between Defendants' failure to implement security measures to protect the PII and PHI and the harm suffered, or risk of imminent harm suffered by Plaintiffs and Class Members.

111.   As a result of Defendants' negligence, Plaintiffs and Class Members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, the costs associated therewith; time spent monitoring, addressing and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

112.   Additionally, as a direct and proximate result of Defendants' negligence, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their PII and PHI, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII and PHI in their continued possession.

113.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring

procedures; and (iii) immediately provide and continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### *Breach of Implied Contract*

114.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

115.    Plaintiffs and Class Members were required to provide their PII and PHI to Defendants as a condition of their use of Defendants' services.

116.    Plaintiffs and Class Members paid money to Defendants in exchange for services, along with Defendants' promise to protect their PII and PHI from unauthorized access and disclosure.

117.    Implicit in the agreement between Plaintiffs and Class Members and the Defendants to provide PII and PHI was the latter's obligation to: (a) use such PII and PHI for business purposes only, (b) take reasonable steps to safeguard that PII and PHI, (c) prevent unauthorized disclosures of the PII and PHI, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII and PHI, (e) reasonably safeguard and protect the PII and PHI of Plaintiffs and Class Members from unauthorized disclosure or uses, and (f) retain the PII and PHI only under conditions that kept such information secure and confidential.

118.    When Plaintiffs and Class Members provided their PII and PHI to Defendants, they entered implied contracts with Defendants pursuant to which Defendants agreed to reasonably protect such information.

119.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

120.     Plaintiffs and Class Members would not have entrusted their PII and PHI to Defendants in the absence of the implied contract between them and Defendants to keep their information reasonably secure, including monitoring its computer systems and networks to ensure that it adopted reasonable data security measures

121.     Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

122.     Defendants breached their implied contracts with Class Members by failing to safeguard and protect their PII and PHI.

123.     As a direct and proximate result of Defendants' breaches of the implied contracts, Class Members sustained damages as alleged herein.

124.     Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

125.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide and continue to provide adequate credit monitoring to all Class Members.

**COUNT III**
**Unjust Enrichment**

126.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

127.     Upon information and belief, Defendants fund their data security measures from its general revenue including payments made by or on behalf of Plaintiffs and the Class Members.

128.     As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

129.     Plaintiffs and Class Members conferred a monetary benefit on Defendants.

130.     Specifically, they purchased goods and services from Defendants and in so doing provided Defendants with their PII and PHI. In exchange, Plaintiffs and Class Members should have received from Defendants the goods and services that were the subject of the transaction and have their PII and PHI protected with adequate data security.

131.     Defendants were aware that any payment for their services was intended for it on behalf of the patient as each individual for whom Defendants maintained PII and PHI was identifiable via the information Defendants collected.

132.     Defendants knew that Plaintiffs and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the PII and PHI of Plaintiffs and Class Members for business purposes.

133.     In particular, Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII and PHI. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective coding and security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the requisite security.

134.     Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members because Defendants

failed to implement appropriate data management and security measures that are mandated by industry standards.

135. Defendants failed to secure Plaintiffs' and Class Members' PII and PHI and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

136. Defendants acquired the PII and PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

137. If Plaintiffs and Class Members knew that Defendants had not secured their PII and PHI, they would not have agreed to provide their PII and PHI to Defendants.

138. Plaintiffs and Class Members have no adequate remedy at law.

139. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII and PHI, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect PII and PHI in its continued possession; and (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest and repair the impact of the PII and PHI compromised as a result of the Data Breach, for the remainder of the lives of Plaintiffs and Class Members.

140.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and noneconomic losses.

141.    Defendants should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiffs and Class Members the proceeds that it unjustly received from them.

**COUNT IV**
**Negligence *Per Se***

142.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

143.    Defendants' duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Defendants and their patients/users, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

144.    Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare, dental, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

145.    Defendants' violation of 45 C.F.R. § 164.530(c)(l) and related HIPAA provisions constitutes negligence *per se.*

146.     Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII and PHI.

147.     Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect PII and PHI. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

148.     Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PHI and PII they obtained and stored and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class Members.

149.     Defendants' violations of Section 5 of the FTC Act constitutes negligence *per se* as Defendants' violation of the FTC Act establishes the duty and breach elements of negligence.

150.     Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

151.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses which—as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices—caused the same harm as that suffered by Plaintiffs and Class Members.

152.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

153.    Defendants knew or should have known that they were failing to meet their duties and that their breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their PII and PHI.

154.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury and damages as alleged herein, and are entitled to compensatory, consequential and punitive damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter an Order:

A.    Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as Class Representative, and appointing Stephan Zouras, LLP, as Class Counsel;

B.    For equitable relief enjoining Defendants from engaging in the conduct described herein pertaining to the misuse and/or improper disclosure of Plaintiffs' and Class Members' PII and PHI, and from neglecting to issue prompt and accurate disclosures to Plaintiffs and Class Members;

C.    Declaring that Defendants' actions, as set forth above, were negligent;

D.    Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class, including an Order requiring Defendants to implement and utilize appropriate protocols and procedures with respect to patient data collection, storage, and safety, and to disclose with specificity the type of PII and PHI compromised during the Data Breach;

E.    For an award of actual damages, compensatory damages, statutory damages and statutory penalties in an amount to be determined and as allowable by law;

F.    Awarding Plaintiffs and the Class their reasonable attorneys' fees and costs and other litigation expenses, including expert witness fees;

G.    Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and,

H.    Awarding such other and further relief as equity and justice may require.

## JURY TRIAL DEMAND

Plaintiffs respectfully demand a trial by jury on all claims so triable.

Dated: January 15, 2024

Respectfully submitted,

By: /s/ *James B. Zouras*

Ryan F. Stephan
James B. Zouras
Molly E. Stemper
STEPHAN ZOURAS, LLP
222 W. Adams St, Suite 2020
Chicago, Illinois 60606
312.233.1550
312.233.1560 f
rstephan@stephanzouras.com
jzouras@stephanzouras.com
mstemper@stephanzouras.com